**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: C.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.C., FATHER | : | No. 3060 EDA 2019 |

Appeal from the Decree Entered September 27, 2019
In the Court of Common Pleas of Montgomery County Orphans' Court at
No(s):  No. 2019-A0053

BEFORE:   BOWES, J., SHOGAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY BOWES, J.:                    **FILED SEPTEMBER 3, 2020**

J.C. ("Father") appeals the September 27, 2019 decree granting the petition of D.M. and P.M. ("Maternal Grandparents"), joined by B.M.[1] ("Mother") (collectively, "Appellees"), to involuntarily terminate his parental rights to his daughter, C.M., who was born in January 2016.  After review, we reverse.

At the outset, we emphasize that this appeal does not involve a challenge to Maternal Grandparents' standing to file a petition for the involuntary termination of Father's parental rights, their averment that an adoption is presently contemplated, their intent to assume custody of C.M. pending the anticipated adoption, or whether Maternal Grandparents had to

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] By separate decree dated and entered the same date, the orphans' court terminated the parental rights of Mother pursuant to her voluntary relinquishment.  While Mother has not filed an appeal from the termination of her parental rights, she has participated in the instant appeal, filing a brief in support of the termination of Father's parental rights.

demonstrate "good cause" pursuant to 23 Pa.C.S. § 2901 in order to complete the adoption without satisfying the procedural requirements outlined in the Adoption Act, 23 Pa.C.S. §§ 2101-2938. As is patently clear from our analysis, none of the foregoing components of the Adoption Act is at issue in the instant appeal.

What this appeal does concern, however, and what we address herein, is Father's assertion that Maternal Grandparents' manipulation of the Adoption Act is contrary to public policy. Stated plainly, this case is an unrestrained custody dispute that belongs in family court, where Father filed the custody petition that triggered Maternal Grandparent's proposed adoption. As the esteemed Justice David N. Wecht highlighted in his concurring opinion in *In re Adoption of M.R.D.*, 145 A.3d 1117, 1133-34 (Pa. 2016), which we discuss *infra*, "Termination of parental rights is an extreme and last-ditch measure. Its finality is striking. It is emphatically not a tool to be deployed in custody disputes." He continued, "To countenance [these] litigation tactics would be to countenance corruption of our adoption laws." *Id*. at 1134.

The following procedural history flows from the certified record. On February 19, 2019, Father filed a custody complaint seeking shared physical custody of his daughter, with whom he had not interacted since the fall of 2016. Father completed the necessary mediation and conciliation requirements in custody court, including the conciliation counselor's recommendation of periods of supervised partial custody. However,

conciliation was not fruitful, and with Mother's assistance and approval, Maternal Grandparents halted the custody proceedings on April 15, 2019, by filing the underlying petition to involuntarily terminate Father's parental rights to C.M.

Mother joined Maternal Grandparents' petition, and filed a petition to voluntarily relinquish her rights to C.M. Maternal Grandparents shortly thereafter filed an adoption petition. The petition regarding Father's parental rights sought termination pursuant to the Adoption Act section which provides for termination of rights where "[t]the parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing a parental claim to a child or has refused or failed to perform parental duties." 23 Pa.C.S. § 2511(a)(1).

The petition proceeded to a hearing conducted on June 10, 2019, and July 17, 2019. Maternal Grandparents, represented by counsel, presented the testimony of Father, Maternal Grandfather, and Mother, who was represented by separate counsel. Father, represented by counsel, presented the testimony of himself and his wife, A.S. Further, C.M. was represented during these

proceedings by legal counsel, who was appointed pursuant to an order entered on May 21, 2019.[2]

The evidence at the hearing revealed that Father has only seen C.M. approximately six or seven times, including at her birth, and has not seen her since the fall of 2016. N.T., 7/17/19, at 42-43; N.T., 6/10/19, at 13, 59, 108, 116-17. After successfully contacting Mother in December 2016 and November 2017,[3] Father was incarcerated from December 2017 to February 2018, after which he resided in Veterans Affairs transitional housing, where visitation with minors was not allowed, until October 2018. N.T., 7/17/19, at 112-14, 159; N.T., 6/10/19, at 60-67. Thereafter, Father again contacted Mother in February 2019. N.T., 7/17/19, at 114-15; N.T., 6/10/19, at 71.

_____

[2] Counsel stated that, due to C.M.'s young age, C.M.'s preference was not ascertainable and that there was no conflict between C.M.'s best interests and legal interests. N.T., 7/17/19, at 177-78. *See In re Adoption of L.B.M.*, 161 A.3d 172, 175, 180 (Pa. 2017) (plurality) (stating that, pursuant to 23 Pa.C.S. § 2313(a), a child who is the subject of a contested involuntary termination proceeding has a statutory right to counsel who discerns and advocates for the child's legal interests, defined as a child's preferred outcome).

[3] Father reported difficulty contacting Mother and believed his telephone number had been blocked, finally getting through when he called from his work phone. N.T., 6/10/19, at 56, 60-61, 107, 117. He further indicated that he had previously been advised that he was not welcome at Mother's residence, where she resided with her parents, and had received a warning from law enforcement against harassment of Mother. *Id*. at 34, 57, 100-04. The orphans' court noted that Father did not present any evidence to corroborate the allegations that Mother called the police or threatened to have him charged with harassment. Orphans' Court Opinion, 9/26/19, at 5.

Mother hung up on him and texted him to "not contact her again." N.T., 7/17/19, at 115-16. Father then filed a custody petition on February 28, 2019. N.T., 7/17/19, at 116; N.T., 6/10/19, at 68.

While Father testified that Mother repeatedly denied that he was the birth father, the orphans' court rejected the notion that Father understood Mother's statements as actually questioning his paternity. *See* Orphans' Court Opinion at 6. Nevertheless, although Mother did not genuinely dispute paternity, she pursued paternity testing with regard to a support matter she instituted in March 2019.[4] N.T., 7/17/19, at 116-17; N.T., 6/10/19, at 61, 65-67, 71, 83, 85.

By decree entered September 27, 2019, the orphan's court involuntarily terminated the parental rights of Father pursuant to 23 Pa.C.S. § 2511(a)(1) and (b). By separate decree, the court also terminated the parental rights of Mother pursuant to her voluntary relinquishment. Father filed a timely notice of appeal on Monday, October 28, 2019,[5] and both Father and the orphans' court complied with Pa.R.A.P. 1925.

Father raises the following issues for our review:

---

[4] Mother subsequently withdrew her support petition. N.T., 6/10/19, at 86.

[5] *See* Pa.R.A.P. 903(a) (notice of appeal shall be filed within 30 days after the entry of the order from which the appeal is taken); 1 Pa.C.S. 1908(2) (providing for the omission of the last day when it falls on a Saturday, Sunday, or legal holiday).

1. Did the [orphans'] court commit an error of law and/or abuse of discretion by finding that termination of Father's parental rights was warranted pursuant to 23 Pa.C.S. § 2511(a)(1)?

2. Did the [orphans'] court commit an error of law and/or abuse of discretion by terminating Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1) and (b)?

Father's brief at 2[6] (suggested answer omitted).

In matters involving involuntary termination of parental rights, our standard of review is as follows:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized [the appellate court's] deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (cleaned up). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even

---

[6] Although Father stated the above issues somewhat differently than in his Rule 1925(b) statement, we conclude that he nevertheless has preserved them for our review.

- 6 -

if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by § 2511 of the Adoption Act and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under [§] 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [§] 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [§] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (internal quotation marks omitted).

The orphans' court concluded that there was sufficient evidence to warrant termination of Father's parental rights under to § 2511(a)(1). Prior to reaching Father's claim that the record does not contain clear and convincing evidence sufficient to terminate his parental rights, we address the

preliminary question of whether a valid proposed adoption was before the orphans' court. *See Adoption of J.D.S.*, 763 A.2d 867 (Pa.Super. 2000) (holding that proposed adoption by stepparent who was separated from the child's mother was not valid, and that, as a result, termination of the father's parental rights was inappropriate).

Instantly, in addressing the motivation for Maternal Grandparents' adoption and Mother's voluntary relinquishment, the orphans' court reasoned,

> This [c]ourt concluded that the birth mother's voluntary relinquishment so that the child may be raised by her parents, the maternal grandparents[,] was reasonable under the unusual circumstances of birth mother, and suited to the needs and welfare of the child. Given birth mother's medical [diagnoses of lupus and scleroderma], her decision to relinquish her parental rights and provide for stability, permanency, security and continuity for her child is understandable. This [c]ourt rejected the implication by birth father that birth mother's voluntary relinquishment of her parental rights was contrived and concluded that termination of birth mother's parental rights on a voluntary basis, together with a contemplated adoption, are in the best interests of the child and will best serve the needs and welfare of the child.

Orphans' Court Opinion, 11/1/19, at 3. While descriptive of Mother's decision to relinquish her parental rights, the foregoing discussion does not expressly account for the involuntary termination of Father's parental rights. In addition, as we highlight *infra*, Maternal Grandparents' noble desire to care for C.M. in Mother's absence can be accomplished without terminating the parental rights of either parent.

Father argues that the termination of his parental rights pursuant to § 2511(a)(1) and (b) does not promote the statutory intent or legislative purpose of the Adoption Act. Father's brief at 22. He states,

> Custody gamesmanship is precisely what occurred in this matter. Mother's testimony was clear that it was not until Father pursued a claim for custody of the child that she decided it was time to file for termination of his parental rights. While Appellees have procedurally complied with the Adoption Act, the testimony of both [M]aternal [G]randfather and Mother was clear that there is no new family unit being created as a result of this adoption, as the parties' roles in the child's life will not change. Mother testified that she has no intentions or plans to move out of Grandparents' home. Mother specifically testified that she did not foresee any change in her daily care of and routines with the child whether or not termination was granted.

*Id*. at 23 (citations to the record omitted).

We agree. This case exemplifies what our High Court envisioned in *In re Adoption of L.J.B.*, 18 A.3d 1098, 1110 (Pa. 2011) (OAJC) in considering the potential for parties to use the Adoption Act as an artifice to gain an advantage in a custody dispute. As articulated by the learned Justice Max Baer's lead opinion, "one can imagine routine cross-petitions for termination as part of custody battles[.]" *Id*. at 1110.

At the outset, we highlight that the orphans' court made a credibility determination in favor of Mother and the maternal grandfather, which we do not disturb. *See* Orphans' Court Opinion, 9/26/19, at 11. The motivation for the adoption is obvious from the credible testimony that they sought to terminate Father's parental rights in order to ensure that C.M. remains with

Maternal Grandparents in the event that Mother's health deteriorates.[7] The maternal grandfather testified, "I just want to make sure [C.M. is] well taken care of and [in] a stable home with us. We want to be consistent with her routines in life and what she knows, with a loving family." N.T., 7/17/19, at 14. In answering why it is important to secure C.M.'s future through adoption, the grandfather phrased it bluntly, "Well, I would have no faith in [Father] after the first three years of her life not wanting to participate with her, and me and [maternal grandmother] having brought her up from when she was a baby." *Id*.

Mother's explanation for the adoption is equally frank. "I don't know what my future is going to be. . . . I love my daughter with everything I have in me, and I need to make sure that her future is completely secure and that I have no doubts about her life . . . as long as she has my parents there for her. *Id*. at 63-64. She later expounded, "If I were . . . to pass away tomorrow, I would have no trust in [Father] raising my child, but I have all the trust in the world [in] my parents. . . [.]" *Id*. at 68. Indeed, when asked about the seemingly urgent need to terminate Father's parental rights at this

---

[7] Notwithstanding the learned dissent's characterization of our rationale, we do not find that the proposed adoption is pretextual. We acknowledge that Appellees' actions are born of love for the child. We simply hold that Appellees cannot utilize the Adoption Act to achieve the desired result because it is contrary to the purpose of the Adoption Act as the High Court articulated in *In re Adoption of M.R.D.*, 145 A.3d 1117, 1120 (Pa. 2016) ("where no new parent-child relationship is contemplated, the involuntary termination of parental rights is not permitted under the Adoption Act.").

juncture, as opposed to the three years before he filed the custody petition, Mother responded, "But he had no interest in being in [C.M.'s] life for those years, so I never had to worry about petitioning for the [termination] of his parental rights." *Id*. 84. Instead, she waited until Father initiated the custody proceedings. The following exchange is telling. When Counsel inquired, "So when he uses the court in 2019 to say I want to see my daughter, that's when you file the petition; is that correct?" Mother replied "Correct." *Id*.at 85. Thus, as demonstrated by the foregoing evidence proffered by two witness whose credibility the orphans' court specifically endorsed, the acknowledged motivation for the adoption is entirely prophylactic. Appellees want to ensure that, if something unfortunate happened to Mother, C.M. has a secure future with Maternal Grandparents, as opposed to Father, who had recently invoked his custodial rights. Phrased differently, the proposed adoption was intended to "secure" C.M.'s future with Maternal Grandparents and "protect" her from Father's intervention, as evidence by his attempt to exercise custody.

As we explain *infra*, the instant petition to terminate Father's parental rights in anticipation of Maternal Grandparents' adoption lacks integrity for two reasons. First, it was triggered primarily by Father's reappearance and custody claim. Second, it does not create a new family unit or a new parent-child relationship.

As Mother testified, she did not believe it imperative to terminate Father's parental rights in order to secure C.M.'s future until **after** Father

demonstrated a resolve to pursue his custody rights. Tellingly, although Mother is legitimately concerned about her daughter's future, Mother did not request that the custody court determine whether she can designate her parents as standby guardians, pursuant to the Standby Guardianship Act. 23 Pa.C.S. §§ 5601-5625. This measure would have been particularly appropriate in the case at bar considering both Father's lack of contact with C.M. and, as evidenced by his ultimate request for supervised partial custody, his inability to exercise primary physical custody of a daughter whom he does not know. *See* 23 Pa.C.S. § 5611(a)(3) (noting that written designation of standby guardian is not appropriate where non-consenting parent is "willing and able to make and carry out the day-to-day child-care decisions concerning the minor").

Likewise, Maternal Grandparents did not attempt to intervene in the underlying custody dispute or seek a conditional legal guardianship of their grandchild. Instead, rather than pursue a less invasive method of securing C.M.'s future, or simply defending against Father's custody claim in family court based upon his three years of inaction, Appellees sought the exceptionally severe remedy of terminating Father's parental rights and the orphans' court obliged. This result is untenable.

As Justice Wecht observed in expressing his disapproval of a similar misuse of the Adoption Act as a strategy to circumvent a custody dispute,

> While Mother's alternative response [to the custody complaint] . . . may have shown creativity and determination, it

- 12 -

did not comport with Pennsylvania law. This is especially so given the demonstrable fact that the [custody] court in this case, like trial courts all across this Commonwealth, has robust discretionary authority to limit and even completely curtail Father's custody rights under the custody statutes without resort to the draconian remedy of termination of parental rights under the adoption laws.

*In re Adoption of M.R.D.*, *supra* at 1134-35 (Wecht concurring). As the custody court had an array of alternatives to decide C.M.'s best interest in the custody dispute between Mother and Father, we do not condone Appellees' use of the Adoption Act in order to evade the custody court's authority.

Furthermore, the proposed adoption does not promote the purpose of the Adoption Act insofar as it does not create a new family unit or a new parent-child relationship. Our Supreme Court addressed a similar issue in *In re Adoption of M.R.D.*, *supra*, in the context of whether a grandparent may stand in the stead of an adopting spouse. The Supreme Court reversed the termination of a father's parental rights where an unmarried mother sought termination and adoption by the maternal grandfather while retaining her parental rights. In finding there was not a valid adoption, the Court recognized, in part:

Because a termination petition filed by one parent against the other must occur in the context of an anticipated adoption, and because adoption is a statutory right, we note that the parent seeking termination must strictly comply with all pertinent provisions of the Adoption Act in order for the adoption to be valid. While the Adoption Act provides that any individual may become an adopting parent, relevant to the instant matter, Section 2711 of the Act requires the parent seeking termination to consent to the adoption and to relinquish his or her parental rights. Requiring parental consent to the adoption and the relinquishment of his or her parental rights permits the child and the adoptive parent or

- 13 -

parents to establish a new parent-child relationship. Thus, **where no new parent-child relationship is contemplated, the involuntary termination of parental rights is not permitted under the Adoption Act**.

. . . .

The purpose behind the termination or relinquishment of an existing parent's rights prior to an adoption is to **facilitate a new parent-child relationship between the child and the adoptive parent**, and to protect the integrity and stability of the **new family unit**.

*In re Adoption of M.R.D.*, *supra* at 1120, 1127-28 (cleaned up, emphases added). In support of its decision, the Court further stated:

although the orphans' court rejected the possibility in the instant case, permitting Grandfather to adopt and co-parent Children with mother would nevertheless open the door for misuse of adoption proceedings by spiteful parents as a means to involuntarily terminate the rights of unwanted parents, potentially allowing grandparents, cousins, pastors, coaches, and a litany of other individuals who have a close relationship with a child to stand in as prospective adoptive parents so that termination may be achieved. Given that the complete and irrevocable termination of parental rights is one of the most serious and severe steps a court can take, we must ensure that we do not open the floodgates to such gamesmanship.

*Id*. at 1129 (cleaned up).

To be clear, our Supreme Court's express **holding** in *In re Adoption of M.R.D.*, *supra* is not dispositive of the case at bar because the issue that the High Court addressed related to "whether a legal parent may establish cause under Section 2901 to excuse the relinquishment requirement and proceed with a proposed adoption by a grandparent." That is not the issue

we confront herein.[8]  Nevertheless, the **rationale** the Supreme Court employed in *In re Adoption of M.R.D.*, is instructive because, in order to reach its ultimate holding, the Supreme Court had to determine what constituted a new parent–child relationship.  As the High Court observed, "where no new parent-child relationship is contemplated, the involuntary termination of parental rights is not permitted under the Adoption Act."  *Id*. at 1120 (cleaned up) (citations omitted).  As framed by the Supreme Court, it had to decide whether "Mother and Grandfather . . . can establish that permitting Grandfather to adopt Children while Mother retains her parental rights will promote a new family unit or that it is otherwise unnecessary to require Mother to relinquish her parental rights under the circumstances of this case."  *Id*. at 1128.

The present case does not involve the anticipation of a valid adoption that promotes a new parent-child relationship or creates a new family unit.  Appellees simply desire to secure C.M.'s future should something happen to Mother, *i.e.*, maintain the status *quo* without Father's interference.  Mother will continue to share a maternal relationship with C.M., whom she

_____

[8] We note that the Supreme Court did not disturb the authority that permits a grandparent from seeking to adopt a grandchild in cases where the child's parent relinquishes his or her parental rights. *In re Adoption of M.R.D.*, 145 A.3d 1117, 1126, 1129 n.4. (Pa. 2016).  However, the Court's acknowledgment of a grandparent's ability to adopt in that situation presupposes facts that are missing herein, *i.e.*, that the proposed adoption will create a new parent-child relationship and promote a new family unit.

characterizes as "like a little mini[-]me." N.T., 7/17/19, at 65. In fact, Mother testified that she and C.M. are "inseparable," and C.M. falls asleep in Mother's bed "every single night." *Id*. at 66. Undeniably, Mother confirmed that her care of C.M. will not change regardless of whether the court grants or denies the petition to terminate Father's rights in anticipation of the proposed adoption. *Id*. at 89. Moreover, regardless of her own petition for voluntary relinquishment, Mother admitted that she remains able and willing to care for C.M. *Id*. at 195. She testified, "I am very willing to care for my child." *Id*.

Like Mother, maternal grandfather testified that he already considered himself and his wife as "like parents" based on the level of care they provide to C.M. *Id*. at 26. Nevertheless, Mother continues to provide C.M. daily parental care without any problems and Maternal Grandfather anticipates that Mother would continue in that role after the proposed adoption to secure the continuity of C.M.'s care. *Id*. at 27-29, 31. Similarly, Maternal Grandparents' current role will not change unless Mother's condition worsens, and there is no plan for Mother to leave the household that she and C.M. have lived in since the child's birth.[9] *Id*. at 24, 29, 31.

_____

[9] We do not base our conclusion on the fact that Mother will continue to reside in Maternal Grandparent's home. The relevant factor is not Mother's post-adoption residence but the reality that **she will continue to perform her parental duties**. As neither Mother nor Maternal Grandparents expects to alter their current roles after the adoption, nothing new is being created. We also note the inaptness of the learned dissent's attempt to compare the current scenario with an adoption of a foster child. Assuming, *arguendo*, that

- 16 -

Although it is also undisputed that Maternal Grandparents have a close and loving relationship with C.M., the evidence indicates that they are nothing more than "stand in[s] as prospective adoptive parents so that termination may be achieved." **M.R.D.**, **supra** at 1129. Though they would share paternal rights between themselves, Maternal Grandparents' demonstrated roles will not change. They will become C.M.'s legal parents but they will continue to act in their ancillary childrearing roles as grandparents. Moreover, while Mother and C.M. would become siblings, at least nominally, Mother's function as C.M.'s parent will endure the absence of formal recognition. The proposed changes to Appellees' family dynamic are entirely titular and constitute neither a "new family unit" nor a "new parent-child relationship." **See In re Adoption of M.R.D.**, **supra** at 1120 ("where no new parent-child relationship is contemplated, the involuntary termination of parental rights is not permitted under the Adoption Act"); **id**. at 1127-28 (purpose behind termination or relinquishment of parental rights prior to adoption is to facilitate new parent-

---

pre-adoption residence is dispositive of whether an adoption creates a new family unit, which it is not, the two scenarios are incongruous. Unlike Mother and Maternal Grandparents, a foster parent does not have any form of custody or legal right to the child **until** the entry of an adoption decree. Prior to that date, the county agency retains both legal and physical custody of the child under the supervision of the juvenile court. Foster parents perform their stewardship roles entirely at the agency's pleasure. Hence, in contrast to the instant situation, which produces nothing more than a contingency for Maternal Grandparents to exclude Father if Mother's health falters, the eventual adoption of a foster child does, in fact, facilitate a new parent-child relationship and the decree promotes the integrity of the new family unit.

child relationship between child and adoptive parent, and to protect integrity and stability of new family unit).

Accordingly, we find that the proposed adoption by Maternal Grandparents is not valid. As a valid adoption is not anticipated, the termination petition as to Father is not cognizable and the termination of his rights is precluded. *Id*. at 1118 ("[A]s the contemplated adoption cannot proceed, we reverse the order affirming the termination of the father's parental rights."). Hence, we do not address the merits of Maternal Grandparents' petition to terminate Father's parental rights pursuant to § 2511(a)(1) and (b).

For the foregoing reasons, we reverse the September 27, 2019 decree and remand to the orphans' court for further proceedings consistent with this memorandum.

Decree reversed. Case remanded. Jurisdiction relinquished.

Judge Shogan joins the memorandum.

Judge Pellegrini files a dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/3/2020

- 18 -